# EXHIBIT 2

Page 1

1       IN THE UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF ILLINOIS
3                EASTERN DIVISION
4   GABRIELA RAMIREZ, FIDELA AVINA,)
5   RUEL NIETO, KATHERINE RANOS,   )
6   and EVALINA GONZALEZ, on behalf)
7   of themselves and all others   )
8   similarly situated,            )
9             Plaintiff,           ) Case No.:
10            vs.                  ) 1:17-cv-02626
11  MIDLAND FUNDING, LLC; MIDLAND  )
12  CREDIT MANAGEMENT, INC.; and   )
13  ENCORE CAPITAL GROUP, INC.,    )
14            Defendants.          )
15
16        The deposition of GABRIELA RAMIERZ,
17  called as a witness for examination, taken
18  pursuant to the Federal Rules of Civil Procedure
19  of the United States District Courts pertaining
20  to the taking of depositions, taken before ANDREA
21  L. KIM, a Certified Shorthand Reporter of said
22  state, CSR No. 84-3722, at Suite 2500, 151 North
23  Franklin street, Chicago, Illinois, on the 12th
24  day of June, A.D. 2018, at 1:42 p.m.

Page 2

1  PRESENT:
2
3      COMMUNITY LAWYERS GROUP, LTD.,
4      (73 West Monroe Street, Suite 514,
5      Chicago, Illinois 60603
6      312-757-1880), by:
7      MS. CELETHA CHATMAN,
8      cchatman@communitylawyersgroup.com,
9          appeared on behalf of the Plaintiff;
10
11     HINSHAW & CULBERTSON, LLP,
12     (151 North Franklin Street, Suite 2500,
13     Chicago, Illinois 60606,
14     (312) 704-3000), by:
15     MS. LINDSEY A.L. CONLEY,
16     lconley@hinshaw.com,
17         appeared on behalf of Defendants.
18
19
20
21
22 REPORTED BY:  ANDREA L. KIM,
23         Illinois CSR No. 84-3722.
24

Page 3

1              I N D E X
2
3  WITNESS:                    PAGE:
4   GABRIELA RAMIREZ
5      EXAM by MS. CONLEY.................  4
6      EXAM by MS. CHATMAN................ 50
7      EXAM by MS. CONLEY................. 51
8
9            *****
10             I N D E X
11 EXHIBIT NUMBER               MARKED
12  Exhibit No. 1.............................. 27
13  Exhibit No. 2.............................. 34
14
15
16
17
18
19
20
21
22
23
24

Page 4

1          (WHEREUPON, the witness was duly
2          sworn.)
3          GABRIELA RAMIREZ,
4  called as a witness herein, having been first
5  duly sworn, was examined and testified as
6  follows:
7              EXAMINATION
8  BY MS. CONLEY:
9      Q.   Hi, Ms. Ramirez.  My name is Lindsey
10 Conley.  I represent the defendants in the
11 lawsuit.  The defendants are Midland Funding,
12 LLC, and Midland Credit Management Incorporated.
13 So I am going to refer to them collectively
14 throughout the deposition sometimes as Midland or
15 MCM or defendants, but if I want to differentiate
16 between the two entities, I will let you know
17 that.
18         Is that all right with you?
19     A.   Yes.
20     Q.   Before we get started, I am going to
21 go over some ground rules with depositions.  I am
22 not sure if you have been to a deposition before
23 today, but I will ask that you that in a second.
24         MS. CONLEY:  Before we start with the ground

Page 5

1  rules, I want to state on the record the
2  deposition of Gabriela Ramirez is taken pursuant
3  to notice, agreement of the parties, and the
4  Federal Rules of Civil Procedure.
5  BY MS. CONLEY:
6      Q.   Can you let me know whether you have
7  done a deposition before or not?
8      A.   No.
9      Q.   It is really just a conversation
10 between you and I.  I am going to ask you some
11 questions.  You are going to give me some
12 responses.
13     A.   Okay.
14     Q.   When I ask a question, I will ask a
15 question, and then I will wait on your response,
16 but when that is happening, it is just best that
17 we aren't speaking at the same time.  It's really
18 hard for the court reporter to transcribe
19 everything that's happening here.
20         So to your left is the court reporter.
21 She's taking down everything that's being said.
22 So it will be very helpful for all of us if you
23 verbalize your responses.
24         I see your shaking your head now so I

Page 6

1  just want to mention it to you because she is not
2  taking down anything that is happening
3  physically.  She is only taking down things that
4  are coming out of each one of our mouths.
5         Is that fine with you?
6     A.   Yes.
7     Q.   As I said, just answer me yes or no or
8  if there are any other things that you would like
9  to explain in response to my questions, that's
10 fine as well.  And so no shaking of the head, no
11 saying uh-huh, but if you do that while you are
12 responding verbally, that's fine as well, but if
13 it happens, I willing remind you.
14    A.   Okay.
15    Q.   If you don't understand any of my
16 questions, it is just best that you let me know
17 that before responding.  I am going to give you a
18 question; you will give me a response, but if you
19 give me a response, I am going to assume that you
20 understood the question.
21    A.   Yes.
22    Q.   So it's best if you don't understand,
23 just let me know.  I will rephrase it, repeat it,
24 anything that would help for you to get an

Page 7

1  understanding.
2         Do you understand that?
3     A.   Yes.
4     Q.   And I am going to ask that you speak
5  loudly enough.  I know the court reporter has
6  some devices here to be able to increase our
7  volume, but it's best that you speak loudly so
8  she isn't working too hard here as well as so
9  your attorney can hear you and I can hear you.
10    A.   Yes.
11    Q.   There may be some times in the
12 deposition when your attorney makes an objection.
13 That's really just for the court purposes.  So we
14 are going to allow her to speak her objection on
15 the record, and then you will give your response.
16 If there's anything that -- or in a question that
17 she doesn't want you to respond to, she will let
18 you know that, but normally you just give your
19 response to my question as normally as you would
20 and as truthfully as you are required to even if
21 she makes an objection.
22        Do you understand that?
23    A.   Yes.
24    Q.   And if you need to take a break, that

Page 8

1  is perfectly fine.  You know where the restrooms
2  are.  We also have some water if you finish your
3  bottle of water there.  Just let me know if you
4  need a break, and we will take a quick break for
5  you.
6         There may be a time in which you need
7  a break, but I may still be in a line of
8  questioning, and I am just going to ask that you
9  be patient with me that I finish that line of
10 questioning before we take a break.  I promise I
11 won't try to hold you long, but quickly finish
12 what I am talking about and you can give your
13 response, and then we will take a break.
14        Is that okay with you?
15    A.   Yes.
16    Q.   And I am going to ask that you speak
17 slowly as well.  I am probably speaking faster
18 than what you would speak, but it's easier for
19 the court reporter.
20        Do you understand that?
21    A.   Yes.
22    Q.   Are there any other things about the
23 ground rules that you want me to clarify or you
24 didn't understand?

Page 9

1     A.   No.
2     Q.   And so were going to get started with
3  the questioning.  Before I get started, there may
4  be some questions in which I ask you that you may
5  feel that are a little bit intrusive.  We are
6  going to talk about some financial information
7  during this deposition.  It's really not to
8  offend you.  It's really just to get the facts
9  about the case, learn a little bit more about
10 yourself.
11        If there are any personal identifiers
12 in which we release throughout this deposition, I
13 will direct the court reporter to redact them for
14 the record.  At that point they are redacted.  No
15 one can see them.  It's going to be blacked out.
16 So it's perfectly fine to give those responses.
17 We will make sure that that information is
18 protected.
19        Do you understand that?
20    A.   Yes.
21    Q.   Can you please state your full name
22 for the record spelling your first and you last
23 name.
24    A.   Gabriela Ramirez, G-A-B-R-I-E-L-A,

3 (Pages 6 - 9)

Page 10

1  Ramirez, R-A-M-I-R-E-Z.
2    Q.  And you have never given a deposition
3  before; is that correct?
4    A.  Yes.
5    Q.  Is there anything that would impair
6  your ability to truthfully and honestly answer my
7  questions today?
8    A.  No.
9    Q.  Are you on any medication that affects
10 your memory?
11   A.  No.
12   Q.  Have you had any alcohol or drugs
13 within the last 24 hours?
14   A.  No.
15   Q.  Did you speak with anyone about the
16 deposition before coming here today?
17   A.  No.
18   Q.  Did you review any documentation
19 before coming to the deposition today?
20   A.  Yes.
21   Q.  Can you let us know what documents you
22 reviewed?
23   A.  Yes, just papers.
24   Q.  That's fine.  You just don't remember

Page 11

1  the names or the titles?
2    A.  No.
3    Q.  Did you do anything other than
4  reviewing documents to prepare for the
5  deposition?
6    A.  No.
7    Q.  Can you please give us your date of
8  birth.
9    A.  (Redacted).
10     MS. CONLEY:  I am just going to direct the
11 court reporter she can redact the date of birth.
12 BY MS. CONLEY:
13   Q.  Can you let me know whether the last
14 four of your Social is (redacted)?
15   A.  Yes.
16     MS. CONLEY:  I will direct the court
17 reporter to redact the digits of the Social
18 Security.
19 BY MS. CONLEY:
20   Q.  Have you ever been convicted of a
21 felony or a crime involving dishonesty?
22   A.  No.
23   Q.  Can you give us your current address?
24   A.  ▇▇▇▇▇▇  Richmond.

Page 12

1    Q.  And what city is that in?
2    A.  Chicago, Illinois.
3    Q.  And how long have you lived at the
4  Richmond address?
5    A.  20 years.
6    Q.  And do you live at the Richmond
7  address with anyone?
8    A.  Yes, with my parents.
9    Q.  Your parents?
10   A.  Yes.
11   Q.  Can you give us your parents' first
12 and last names?
13   A.  Maria and Antonio Ramirez.
14   Q.  Thank you.  Do your parents own the
15 home that you stay in?
16   A.  Yes.
17   Q.  Is it a house or is it an apartment?
18   A.  It's a house that has an apartment.
19   Q.  So it's what we would say like a
20 three-flat or a two-flat?
21   A.  Yes.
22   Q.  And do you -- are any of those parts
23 rented out to anyone?
24   A.  Yes.

Page 13

1    Q.  Who are they rented out to?
2    A.  To my sisters.
3    Q.  And how many sisters do you have?
4    A.  Two.
5    Q.  And how old are your sisters?
6    A.  32 and 28.
7    Q.  And do you rent any of the portions of
8  your parents' home?
9    A.  No, I live with my parents, but I give
10 them money.
11   Q.  Okay.  Is that the only address that
12 you have ever lived at?
13   A.  No, I lived on other ones, but I can't
14 remember the address right now.
15   Q.  That was when you were small?
16   A.  When I was smaller.
17   Q.  So there's been no other address
18 within the 20 years that you have been with your
19 parents?
20   A.  No.
21   Q.  Do you have a current telephone
22 number?
23   A.  No.
24   Q.  No cell phone?

Page 14

1   A.   No.
2   Q.   And you use your parents' home number
3  if you need a phone?
4   A.   Yes.
5   Q.   Can you please provide us that home
6  number.
7   A.   (Redacted) 2021.
8       MS. CONLEY:  I'll just ask that the court
9  reporter redact all the digits except for the
10 last four of the telephone number.
11 BY MS. CONLEY:
12  Q.   Are you currently married?
13  A.   No.
14  Q.   Have you ever been married?
15  A.   No.
16  Q.   Do you have any children?
17  A.   No.
18  Q.   Do you have any dependents other than
19 yourself?
20  A.   No.
21  Q.   Have you ever gone by any other names
22 than Gabriela Ramirez?
23  A.   No.
24  Q.   Can you please tell us your highest

Page 15

1  level of education.
2   A.   Some college.
3   Q.   Where did you go some college?
4   A.   National Louis University.
5   Q.   What did you study at National Louis
6  University?
7   A.   For teaching.
8   Q.   Are you still a student at National
9  Louis University?
10  A.   No.
11  Q.   When was the last time you were
12 enrolled in school?
13  A.   I can't remember but a couple years
14 ago.
15  Q.   Did you obtain any certifications
16 while you were at National Louis University?
17  A.   No.
18  Q.   Any degrees of any other sort?
19  A.   No.
20  Q.   And would you say you were last
21 enrolled in National Louis University more than
22 two years ago?
23  A.   Yes.
24  Q.   Are you currently employed?

Page 16

1   A.   Yes.
2   Q.   Where are you employed?
3   A.   NewStream.
4   Q.   News -- can you spell it for us?
5   A.   N-E-W-S-T-R-E-A-M.
6   Q.   NewStream?
7   A.   NewStream.
8   Q.   And what do you do at NewStream?
9   A.   Maintenance.
10  Q.   Maintenance?
11  A.   Yes.
12  Q.   Are you a full-time worker or a
13 part-time?
14  A.   Full-time.
15  Q.   And are you paid on an hourly basis or
16 a salary?
17  A.   Hourly basis.
18  Q.   And where is NewStream located?
19  A.   Joliet.
20  Q.   And who is your current supervisor at
21 NewStream?
22  A.   Michelle.
23  Q.   Michelle.  Do you know her last name?
24  A.   I forgot her last name, but her first

Page 17

1  name is Michelle.
2   Q.   And how long have you been employed at
3  NewStream?
4   A.   One year.
5   Q.   Prior to employment at NewStream,
6  where did you work?
7   A.   I was a librarian at National Louis
8  University.
9   Q.   And how long were you a librarian at
10 National Louis University?
11  A.   Five years.
12  Q.   Was that a part-time position or
13 full-time?
14  A.   Part-time.
15  Q.   Were you working at National Louis
16 University while you were enrolled in school?
17  A.   Yeah.
18  Q.   Were you paid on an hourly basis or
19 was it a part of some type of work study?
20  A.   It was work study.
21  Q.   So would you say you were enrolled at
22 National Louis University for the entire five
23 years that you worked there?
24  A.   Yes.

5 (Pages 14 - 17)

Page 18

1  Q. Did you have any other employment
2  while you were at National Louis University?
3  A. No.
4  Q. Have you been employed anywhere else
5  other than NewStream and National Louis
6  University?
7  A. No.
8  Q. Do you have any other sources of
9  income other than your job at NewStream?
10 A. No.
11 Q. Have you ever filed for bankruptcy?
12 A. No.
13 Q. Have you ever filed a lawsuit other
14 than the litigation that we are here for today?
15 A. No.
16 Q. Have you ever been a party to a
17 lawsuit other than the one we are here for today?
18 A. No.
19 Q. Have you ever been sued by anyone
20 before?
21 A. Yes.
22 Q. And who have you been sued by?
23 A. Midland Funding.
24 Q. And is that it?

Page 19

1  A. Yes.
2  Q. You have never been sued by anyone
3  else?
4  A. No.
5  Q. And the lawsuit in which you were sued
6  by Midland, is that lawsuit still pending?
7  A. No.
8  Q. Can you let us know what was the
9  result of that lawsuit?
10 A. It was discharged.
11 Q. What do you mean by discharged?
12 A. I don't know. That's what I -- I
13 think -- I don't know.
14 Q. Is your understanding that the
15 litigation is over that lawsuit?
16 A. It's over. Yeah, it's over.
17 Q. And did you receive any monetary
18 compensation to end that lawsuit?
19 A. No.
20 Q. Did you have to pay any money to end
21 that lawsuit?
22 A. No.
23 Q. And have you been involved in a class
24 action other than the class action we are here

Page 20

1  for today?
2  A. No.
3  Q. Can you let me know your understanding
4  of what a class representative is?
5  A. It's group of people that have one
6  thing -- that have the same thing in common.
7  Q. And can you let me know what you
8  believe your duties are as a class
9  representative?
10 A. To represent the other people to go --
11 to go to the court.
12 Q. Is that it?
13 A. Uh-huh.
14 Q. Have you ever spoken to any of the
15 other class representatives involved in the
16 litigation in which we are here for today?
17 A. No.
18 Q. Do you have any friends or family that
19 works in the debt collection industry?
20 A. No.
21 Q. Do you have any friends or family that
22 works in the credit reporting industry?
23 A. No.
24 Q. Have you discussed the claims of this

Page 21

1  lawsuit with anyone other than your attorneys?
2  A. No.
3  Q. Can you let me know why you are suing
4  the defendants in the lawsuit that we are here
5  for today?
6  A. Yes, because they said that they were
7  going to put the account on an attorney and they
8  weren't going to give me flexible options to pay
9  the debt.
10 Q. Have you ever had a Citibank credit
11 card that was branded as a Sears MasterCard?
12 A. Yes.
13 Q. Do you believe that Citibank credit
14 card is the account that is at issue in the
15 lawsuit that we are here for today?
16 A. Can you repeat the question?
17 MS. CONLEY: Can you repeat the question for
18 us.
19     (WHEREUPON, the record was read
20     by the reporter.)
21 BY THE WITNESS:
22 A. Yes.
23 BY MS. CONLEY:
24 Q. Did you ever use the Citibank credit

6 (Pages 18 - 21)

Page 22

```
 1  card?
 2     A.   Yes.
 3     Q.   What did you use it for?
 4     A.   For food.
 5     Q.   Is that it?
 6     A.   Yes.
 7     Q.   What was the food for?
 8     A.   For me.
 9     Q.   When did you open the Citibank credit
10  card account?
11     A.   I don't remember.  It was a long time
12  ago.
13     Q.   Do you recall it being in 2011?
14     A.   Probably.
15     Q.   Did you apply -- how do you apply for
16  the Citibank credit card?
17     A.   I just applied.  I think I did a form
18  I think.
19     Q.   Did you do it at the Sears store, or
20  did you do it online?
21     A.   On the Sears store.
22     Q.   And did you ever buy any merchandise
23  from Sears on the Citibank credit card?
24     A.   I don't remember.  I don't remember.
```

Page 23

```
 1     Q.   When you received the Citibank credit
 2  card, did it come to you in the mail?
 3     A.   I think so.
 4     Q.   Have you ever had any other credit
 5  cards other than the Citibank credit card?
 6     A.   No.
 7     Q.   That's your only credit card you have
 8  ever had in your life?
 9     A.   Yes.
10     Q.   And when you got the Citibank credit
11  card in the mail, did it come with any
12  documentation with it?
13     A.   I don't remember.  It was a long time
14  ago.  I don't remember.
15     Q.   Do you remember having a balance on
16  the Citibank credit card when you stopped using
17  it?
18     A.   Yes.
19     Q.   Did you ever make any payments on the
20  Citibank credit card?
21     A.   Yes.
22     Q.   When did you stop using the credit
23  card?
24     A.   I can't remember.  It was a long time
```

Page 24

```
 1  ago.  Probably a couple years ago.
 2     Q.   So more than two years you would say?
 3     A.   Yeah, probably.
 4     Q.   Do you remember the last time you made
 5  a payment on the Citibank credit card?
 6     A.   I can't remember the year.
 7     Q.   Was that more than two years ago?
 8     A.   Yes.
 9     Q.   Do you still have the credit card?
10     A.   No.
11     Q.   What did you do with it?
12     A.   I don't know.  I had it in my room,
13  but then I don't know.
14     Q.   Do you think you lost it?
15     A.   I think -- I don't have it.  I don't
16  know if it's misplaced or...
17     Q.   Did you intentionally stop using the
18  card for any reason?
19     A.   No, I just -- I just stopped using it.
20     Q.   Why did you leave a balance on the
21  credit card when you stopped using it?
22     A.   I just -- I just -- I was trying -- I
23  was paying it but it was -- I was just trying to
24  pay it.
```

Page 25

```
 1     Q.   You were just trying to pay the card?
 2     A.   Uh-huh.
 3     Q.   Was that the issue that you could no
 4  longer pay it?
 5     A.   It's like I didn't -- I was not
 6  working.
 7     Q.   You didn't have the money to pay the
 8  credit card is what you are trying to
 9  communicate?
10     A.   Yes, I didn't have the money.
11     Q.   And if you had the money to pay the
12  balance on the credit card, would you have paid
13  it?
14         MS. CHATMAN:  Objection, calls for
15  speculation.  You may answer.
16  BY THE WITNESS:
17     A.   If they would have given me reasonable
18  payments, I could have probably.
19  BY MS. CONLEY:
20     Q.   When you stopped using the credit card
21  and you realized you had a balance on the card,
22  did you ever try to contact Citibank?
23     A.   No.
24     Q.   And why not?
```

Page 26

1  A. No, I don't know.
2  Q. Were you aware that your Citibank
3  credit card account was sold to Midland Funding?
4  A. Yes.
5  Q. And how did you become aware of that?
6  A. I received a letter.
7  Q. And when did you receive the letter?
8  A. It was like 2016, I think.
9  Q. Is that the letter that is at issue in
10 the lawsuit?
11     MS. CHATMAN: Objection, calls for
12 speculation. You may answer.
13 BY THE WITNESS:
14  A. I don't know.
15 BY MS. CONLEY:
16  Q. After you became aware that Midland
17 Funding owned the Citibank credit card account,
18 did you ever try to contact Midland Funding or
19 Midland Credit Management to pay the balance on
20 the account?
21  A. No.
22  Q. Have you ever spoken with anyone at
23 Midland Credit Management or Midland Funding
24 regarding the Citibank credit card account?

Page 27

1  A. No.
2  Q. I am going to show you some documents.
3  We are going to have this marked as Exhibit 1.
4      (WHEREUPON, a certain document
5       was marked Ramirez Deposition
6       Exhibit No. 1, for
7       identification, as of 6/12/18.)
8  BY MS. CONLEY:
9  Q. If you can take a look at this first
10 page here?
11  A. Yes.
12  Q. And can you let me know what this
13 looks like to you?
14  A. Like an account statement.
15  Q. And do you recognize this account
16 statement to be the Citibank credit card that we
17 have been talking about today?
18  A. Yeah.
19  Q. And if you can look down at the bottom
20 left-hand corner, is that your name and your
21 current address listed there?
22  A. Yes.
23  Q. Did you receive statements like the
24 one that we are looking at Exhibit 1 from

Page 28

1  Citibank?
2  A. Yes.
3  Q. And how often did you receive account
4  statements from Citibank?
5  A. Monthly.
6  Q. And do you remember receiving this
7  particular statement?
8  A. No.
9  Q. Do you see payment due date? It's in
10 the right corner there.
11     Do you see that?
12  A. Yes.
13  Q. Do you see that being March 8, 2016?
14  A. Yes.
15  Q. And can you look at the second box
16 that's on the left-hand side.
17     Do you see that little box there?
18  A. This one (indicating)?
19  Q. The left. The other side of the page.
20  A. This one (indicating)?
21  Q. Yes. Do you see that box?
22  A. Yes.
23  Q. Toward the bottom of that box, it says
24 statement closing date.

Page 29

1      Do you see that?
2  A. Yes -- yes.
3  Q. And do you see that date as being
4  February 10, 2016?
5  A. Yes.
6  Q. And do you remember receiving the
7  Citibank credit card statements around February
8  of 2016?
9  A. I can't remember. I can't remember.
10  Q. Is there anything that would lead you
11 to believe that you didn't receive this statement
12 in the mail that has your name and your address
13 on it?
14  A. I don't know. I don't remember.
15  Q. Is it likely that you did receive it,
16 and you just don't remember seeing this
17 particular one?
18     MS. CHATMAN: Objection, calls for
19 speculation. You may answer.
20 BY THE WITNESS:
21  A. I don't know.
22 BY MS. CONLEY:
23  Q. Have you had any issues with your
24 mail?

8 (Pages 26 - 29)

Page 30

```
 1    A.   No.
 2    Q.   Can you take a look at the -- on the
 3  left the first box, it says summary of account
 4  activity.
 5         Do you see that box?
 6    A.   Oh, summary.  Okay.
 7    Q.   Do you see new balance that's listed
 8  towards the bottom of that first box on the left?
 9    A.   Yeah, yes.
10    Q.   And do you see that new balance being
11  $2,462.92?
12    A.   Yes.
13    Q.   And can you flip two pages -- four
14  pages to number MCM 101.  It's labeled down at
15  the bottom corner.
16    MS. CHATMAN:  She is there.
17  BY MS. CONLEY:
18    Q.   What does this document look like to
19  you?
20    A.   It's an account statement.
21    Q.   Does it look similar to the first
22  account statement that I showed you?
23    A.   Yes.
24    Q.   Do you recognize this as being an
```

Page 31

```
 1  account statement from the Citibank credit card
 2  that we have been talking about today?
 3    A.   Yes.
 4    Q.   And looking at that second box on the
 5  left-hand side of the page, do you see that
 6  second box there?
 7    A.   This one (indicating)?
 8    Q.   Yes.  And if you go down toward the
 9  bottom, do you see statement closing date?
10    A.   Yes.
11    Q.   And you see that date as being March
12  11, 2016?
13    A.   Yes.
14    Q.   And can you look down toward the
15  bottom left-hand corner of the page.
16         Is that your name and your address
17  listed?
18    A.   Yes.
19    Q.   Is there anything that would lead you
20  to believe that you did not receive this
21  statement in the mail?
22    A.   No.
23    Q.   Can you take a look at that first box
24  on the left-hand side where it says summary of
```

Page 32

```
 1  account activity.
 2         Do you see that?
 3    A.   Uh-huh, yes.
 4    Q.   Towards the bottom of that box, it
 5  says new balance.
 6         Do you see that?
 7    A.   Yes.
 8    Q.   Do you see the balance as being
 9  $2,552.14?
10    A.   Yes.
11    Q.   And can you take a -- flip to page MCM
12  105.  It's a few pages after which you are
13  looking at now.
14    A.   Uh-huh.
15    Q.   At the top of this document, it says
16  credit card agreement or card agreement rather?
17    A.   Yes.
18    Q.   Does this document look like something
19  that came in the envelope with your credit card
20  when you received it in the mail?
21    MS. CHATMAN:  Objection, calls for
22  speculation.
23  BY THE WITNESS:
24    A.   No.
```

Page 33

```
 1  BY MS. CONLEY:
 2    Q.   It doesn't look like it?
 3    A.   No.
 4    Q.   But you don't remember what was in the
 5  envelope, do you?
 6    A.   No, I don't remember.
 7    Q.   Can you let me know your understanding
 8  about how credit cards work?
 9    MS. CHATMAN:  Objection, calls for a legal
10  conclusion.  You may answer.
11  BY THE WITNESS:
12    A.   They work like money.
13  BY MS. CONLEY:
14    Q.   So do you know what your supposed to
15  do as a result of using the card?
16    A.   Yes.
17    Q.   What are you supposed to do after you
18  use the card?
19    A.   You are supposed to pay.
20    Q.   So you understanding is that you can
21  make purchases on it, and after you do that, you
22  are supposed to pay --
23    A.   Yes.
24    Q.   -- the amount that you purchased?
```

Veritext Legal Solutions
www.veritext.com                                    888-391-3376

Page 34

1  A. Yes.
2  Q. But you weren't able to pay the full
3  amount, that's correct?
4  A. Yes.
5  Q. So you mentioned that you sued Midland
6  because of a letter that they sent to you?
7  A. Yes.
8  Q. Do you remember when you received that
9  letter?
10 A. I think it was in 2016, I think.
11 Q. 2016 you said?
12 A. I think.
13 Q. I am going to show you another
14 document.
15 MS. CONLEY: Mark this Exhibit 2.
16       (WHEREUPON, a certain document
17        was marked Ramirez Deposition
18        Exhibit No. 2, for
19        identification, as of 6/12/18.)
20 BY MS. CONLEY:
21 Q. If you can take a look at Exhibit 2,
22 and let me know what this looks like to you.
23 A. A letter.
24 Q. And can you let me know looking toward

Page 35

1  the top left-hand side of the page, is that your
2  name and your address listed there?
3  A. Yes.
4  Q. What's the date right above that?
5  A. August 29, 2016.
6  Q. Is this the letter that you were
7  telling me that you received from Midland Credit
8  Management?
9  A. Yes.
10 Q. And can you let me know what you
11 believe this letter is telling you.
12 MS. CHATMAN: Objection, calls for a legal
13 conclusion. You may answer.
14 BY THE WITNESS:
15 A. Telling me that they are going to get
16 an attorney, and they are not going to give me
17 flexible options to pay the account.
18 BY MS. CONLEY:
19 Q. Is that the only thing that this
20 letter is telling you?
21 A. Yeah.
22 Q. That's the only thing this letter
23 says?
24 A. That and to mail $500 or call them.

Page 36

1  Q. What does the top of the letter say
2  under Dear Gabriel?
3      It looks like they spelled your name
4  wrong, but that's your address listed there.
5  What does that first paragraph say?
6  A. That it was sold to Midland Funding.
7  Q. So this is how you found out that your
8  account now was owned by Midland?
9  A. Yes.
10 Q. Did you try to contact Midland or
11 Midland Credit Management after knowing that the
12 account was owned by Midland Funding?
13 A. No.
14 Q. Did you make any payments on the
15 account after receiving the letter that we marked
16 as Exhibit 2?
17 A. No, I don't remember, no.
18 Q. Have you ever paid any money to
19 Midland Funding for your Citibank credit card
20 account?
21 A. I paid the Sears card, but I don't
22 remember like if it was Sears or it was Midland.
23 Q. So you remember paying some amount of
24 money on the account, but you don't remember who

Page 37

1  you sent the money to?
2  A. Yes.
3  Q. When do you remember paying that
4  money?
5  A. I don't remember, but I remember
6  paying.
7  Q. Was it before you received the letter
8  that we marked as Exhibit 2?
9  A. I don't remember.
10 Q. And what else -- what do you see wrong
11 with this letter?
12 A. That they are going to get an
13 attorney, and they are not going to give me
14 options to pay.
15 Q. And why do you think that's wrong?
16 A. Because they are lying.
17 Q. Why do you say they are lying?
18 A. Because I should have -- I should be
19 able to -- be able to make some flexible payment.
20 Q. Why do you believe you should be able
21 to make some flexible payment?
22 A. So I could, you know, try to pay the
23 debt.
24 Q. Did you ever try to pay the debt?

10 (Pages 34 - 37)

Page 38

1  A. Yes, I paid the account. I paid.
2  Q. Did you ever try to pay Midland
3  Funding?
4  A. I paid the credit card, but I don't
5  remember. That's what I don't remember.
6  Q. Did you ever write a check to Midland?
7  A. No.
8  Q. Did you ever call Midland and give
9  them your banking information?
10 A. No.
11 Q. Did you ever send any cash money to
12 Midland?
13 A. No.
14 Q. Did you ever send a check to Citibank?
15 A. No.
16 Q. Did you ever give Citibank your
17 banking information?
18 A. No.
19 Q. Did you ever send any cash to Citibank
20 to pay the credit card?
21 A. No. I would pay it in -- I would pay
22 it in the currency exchange.
23 Q. You went to the currency exchange?
24 A. Yes.

Page 39

1  Q. Which currency exchange did you go to?
2  A. Currency exchange, the one that's
3  on -- it's on Archer, by Archer and California.
4  Q. When was the last time you went to
5  that currency exchange to pay the Citibank credit
6  card?
7  A. I don't remember. It was a long time
8  ago.
9  Q. What would you say is a long time ago?
10 A. Couple years.
11 Q. It's been more than two years?
12 A. Yeah.
13 Q. Has it been more than three years?
14 A. More than two years, probably more
15 than --
16 Q. You said probably more than three?
17 A. I don't remember.
18 Q. Would you say the last time you
19 probably went to that currency exchange to pay
20 the Citibank credit card was in 2015?
21 A. I really don't remember. I can't
22 remember. I am not good with dates. I don't
23 know.
24 Q. I didn't hear what you said.

Page 40

1  A. I don't remember.
2  Q. Did you say you are not good with --
3  what were you saying you were not good with?
4  A. Dates.
5  Q. Dates. Okay.
6  When you would go to the currency
7  exchange to make the payment, did you receive any
8  type of receipt for the payment?
9  A. Yes.
10 Q. And did you keep those receipts?
11 A. No.
12 Q. What did you do with them?
13 A. I probably lost them.
14 Q. But you didn't make any payments on
15 the account after receiving the letter Exhibit 2?
16 You never paid Midland any money?
17 A. I can't remember.
18 Q. So you said that you believed that the
19 statement that was in the letter was a lie; is
20 that correct?
21 Is that what your testimony was? Is
22 that what you said?
23 A. Yeah.
24 Q. What's your definition of a lie?

Page 41

1  MS. CHATMAN: Objection, calls for
2  speculation. You may answer.
3  BY THE WITNESS:
4  A. I don't know.
5  BY MS. CONLEY:
6  Q. You don't know what you believe is a
7  lie?
8  A. When they tell me that something is
9  not true.
10 Q. Why don't you believe this statement
11 to be true?
12 A. When I read this, I didn't -- that's
13 when I saw that they were going to get an
14 attorney. That's when I went to get an attorney
15 too.
16 Q. Is that why you believe it's not true?
17 A. Well, I don't know. It's when I read
18 it, that's the best option for me was to get an
19 attorney to help me with my debt.
20 Q. But you said that you believed that
21 the statement if the account goes to an attorney,
22 flexible options may no longer be available to.
23 You said that you don't believe that's true?
24 A. No, it's when I read that, that's when

11 (Pages 38 - 41)

Page 42

1  I received this letter. I didn't know what to
2  do. So that's when I -- I don't understand it.
3  So I decided to get an attorney to get help with
4  my debt.
5      Q.  So are you saying that you believe
6  that they would get an attorney, and that's why
7  you got an attorney?
8      A.  Yes.
9      Q.  And who was the attorney that you
10 hired after you got this letter?
11     A.  Then I went -- my lawyer.
12     Q.  Is it your lawyer that is sitting next
13 to you today?
14     A.  (No audible response.)
15     Q.  Yes?
16     A.  Yes.
17     Q.  How long after when you received the
18 letter did you hire your attorneys?
19     A.  Probably -- I can't remember a
20 specific time, but because I couldn't understand
21 the letter, then I decided I needed help.
22     Q.  So when you got this letter in the
23 mail, you didn't understand it?
24         MS. CHATMAN: Objection, mischaracterizes

Page 43

1  testimony. You may answer.
2  BY THE WITNESS:
3      A.  I read it, but I thought that it was
4  better for me to get help.
5  BY MS. CONLEY:
6      Q.  Did you understand the letter when you
7  read it?
8      A.  Yes.
9      Q.  And what was your understanding of the
10 letter when you read it?
11         MS. CHATMAN: Objection, asked and answered.
12 You may answer.
13 BY THE WITNESS:
14     A.  That I was no longer -- that I was no
15 longer going to have an option to pay, to have
16 flexible payments.
17 BY MS. CONLEY:
18     Q.  And what does flexible payments mean
19 to you?
20     A.  Like reasonable amount that I could
21 pay monthly.
22     Q.  I'm sorry?
23     A.  Reasonable amount that I could pay
24 monthly.

Page 44

1      Q.  And what was that? What was the
2  reasonable amount that you could pay monthly?
3      A.  Probably $50 a month.
4      Q.  And what's the current balance that's
5  listed on Exhibit 2?
6          Do you see that at the top right-hand
7  corner in that little box?
8      A.  $2,552.14.
9      Q.  So you are saying that you could pay
10 $50 a month to pay that amount off until it was
11 paid?
12     A.  Yes.
13     Q.  And did you call the number that's
14 listed on this letter to pay that $50 a month?
15         MS. CHATMAN: Objection, asked and answered.
16 You may answer.
17 BY THE WITNESS:
18     A.  No.
19 BY MS. CONLEY:
20     Q.  Have you ever paid Midland Funding or
21 Midland Credit Management $50 a month?
22     A.  No.
23     Q.  You mentioned being sued by Midland;
24 is that correct?

Page 45

1      A.  Yes.
2      Q.  You were sued on this particular
3  account; is that correct?
4      A.  Yes.
5      Q.  How did you find out about your
6  attorneys after you received the letter?
7      A.  By mail.
8      Q.  You got something in the mail from
9  your attorneys?
10     A.  Yes.
11     Q.  And was that correspondence that you
12 received from your attorneys before you got this
13 letter or after?
14     A.  Can you repeat the question?
15     Q.  The letter that you got from your
16 attorneys, was it before the letter from Midland
17 Credit Management or was it after you received
18 Exhibit 2?
19     A.  After.
20     Q.  Have you had to pay your attorneys any
21 money since you have hired them?
22     A.  No.
23     Q.  Have you had any communications with
24 Midland Funding or Midland Credit Management

Page 46

1  regarding payment options after you received this
2  letter?
3     A.  No.
4     Q.  When you got this letter in the mail,
5  did you show it to anybody else other than your
6  attorneys?
7     A.  No.
8     Q.  Did you ever ask your parents to help
9  you with the Citibank credit card account?
10    A.  No.
11    Q.  Can you let me know how this letter
12 hurt you in any way?
13    A.  Got me stressed and -- got me
14 stressed.
15    Q.  Is that the only way that it affected
16 you or harmed you?
17    MS. CHATMAN:  Objection, calls for a legal
18 conclusion.  You may answer.
19 BY THE WITNESS:
20    A.  Yes.
21 BY MS. CONLEY:
22    Q.  Can you describe your stress to me?
23    A.  I got nervous.
24    Q.  Why did you get nervous?

Page 47

1     A.  Something unknown, I guess.
2     Q.  What's the something that was unknown?
3     A.  That they were going to get an
4  attorney.
5     Q.  So you were afraid that they were
6  going to get an attorney?
7     A.  Yes.
8     Q.  Is that why you contacted your
9  attorney?
10    A.  Yes.
11    Q.  And is that the only thing that made
12 you stressed or nervous?
13    A.  Yes.
14    Q.  Did anything happen to you physically
15 because of you being stressed or nervous?
16    A.  No.
17    Q.  So would you say that your stress or
18 your nervousness really affected you emotionally
19 and not physically?
20    A.  Emotionally, yeah.
21    Q.  So what happened with your emotions
22 because of your stress or nervousness?
23    A.  I was more sad, more couldn't
24 concentrate on things.

Page 48

1     Q.  What did you do because you were sad?
2     A.  It was -- I would live my life, but it
3  just kind of like affected my emotions, you know,
4  like.
5     Q.  You were able to do everything you do
6  every other day but you were just sad?
7     A.  Yes.
8     Q.  Did you ever see some type of medical
9  professional because of the letter?
10    A.  No.
11    Q.  Did you ever take some type of
12 medication because of being sent the letter?
13    A.  No.
14    Q.  How many times have you spoken with
15 your attorney since you have been involved in the
16 lawsuit that you filed against Midland Credit and
17 Midland Funding?
18    A.  Once.
19    Q.  Did you speak with them over the phone
20 or in person?
21    A.  Both.
22    Q.  You spoke with them over the phone and
23 in person?
24    A.  Yeah.

Page 49

1     Q.  But you only spoke with them one time?
2     A.  I came to the office probably like two
3  times.
4     Q.  How many times did you speak with them
5  over the phone?
6     A.  Two.
7     Q.  When you hired your attorneys, what
8  was your expectation of what they would do for
9  you?
10    MS. CHATMAN:  Objection, asked and answered
11 You may answer.
12 BY THE WITNESS:
13    A.  Help me with my debt.
14 BY MS. CONLEY:
15    Q.  What do you mean by help you with your
16 debt?
17    A.  Assist me.
18    Q.  Assist you in what way?
19    A.  Just help me.
20    Q.  Did you need assistance with trying to
21 pay the debt?
22    A.  (No audible response.)
23    Q.  Is that a yes?
24    A.  Yeah.

13 (Pages 46 - 49)

Page 50

 1  Q. And is that the assistance that you
 2 needed?
 3  A. Yes.
 4  MS. CONLEY: No further questions.
 5          EXAMINATION
 6 BY MS. CHATMAN:
 7  Q. I have a couple of questions.
 8     Ms. Ramirez, if you were appointed
 9 class representative in this case, are you
10 willing to go to trial?
11  A. Yes.
12  Q. Are you willing to go to a settlement
13 conference if one is set in this case?
14  A. Yes.
15  Q. Ms. Ramirez, do you think it was right
16 for Midland Funding -- strike that.
17     Do you think it was right for Midland
18 Credit Management to send you this letter which
19 has been marked as Exhibit 2?
20  A. If it was right?
21  Q. Uh-huh.
22  A. No.
23  Q. Okay. Why wasn't it right?
24  A. Because they would take me -- they

Page 51

 1 would take out the opportunity for me to make
 2 flexible payment.
 3  Q. Do you think that harmed you?
 4  A. Yes.
 5  MS. CHATMAN: No further questions.
 6        FURTHER EXAMINATION
 7 BY MS. CONLEY:
 8  Q. I have follow-up questions for that.
 9     You say you don't think it was right
10 for Midland Credit Management to send you the
11 letter; is that correct?
12  A. Yes.
13  Q. You said that was because it took away
14 your opportunity to make payments on the account?
15  A. Flexible payments.
16  Q. Flexible payments.
17     Do you believe you have the right for
18 flexible payments on a debt that you owe?
19  A. Yeah.
20  Q. Do you believe that Midland Credit
21 Management and Midland Funding is obligated under
22 the law to give you flexible payment options?
23  MS. CHATMAN: Objection, calls for a legal
24 conclusion. You may answer.

Page 52

 1 BY THE WITNESS:
 2  A. I don't know.
 3 BY MS. CONLEY:
 4  Q. If someone owed you money, do you
 5 think that you are obligated to give them
 6 flexible payment options to pay you back if you
 7 wanted all of your money back at one time?
 8  MS. CHATMAN: Objection, calls for
 9 speculation. You may answer.
10 BY THE WITNESS:
11  A. I would give them an opportunity to
12 pay me back.
13 BY MS. CONLEY:
14  Q. But do you believe that you are
15 required to do that?
16  A. If I wanted to, yeah.
17  Q. If you wanted to, but no one says you
18 have to; is that correct?
19  MS. CHATMAN: Objection, asked and answered
20 BY THE WITNESS:
21  A. I don't know.
22 BY MS. CONLEY:
23  Q. If I owe you $10 and you say you want
24 your $10 tomorrow, are you required to let me pay

Page 53

 1 you $5 today and $5 next week?
 2  MS. CHATMAN: Objection, calls for
 3 speculation. You may answer.
 4 BY THE WITNESS:
 5  A. I don't know.
 6 BY MS. CONLEY:
 7  Q. You don't know the answer to that
 8 question?
 9  A. If it was on me, I could let you.
10  Q. You could make that decision?
11  A. Uh-huh.
12  Q. But are you required to make that
13 decision or it's your choice?
14  MS. CHATMAN: Objection, calls for
15 speculation.
16 BY THE WITNESS:
17  A. I don't know.
18 BY MS. CONLEY:
19  Q. You don't know the answer to that
20 question?
21  A. Uh-uh.
22  Q. Why not?
23  MS. CHATMAN: Objection, asked and answered
24

Page 54

1 BY THE WITNESS:
2  A.  I don't know.
3 BY MS. CONLEY:
4  Q.  Why don't you know the answer to that
5 question?
6  A.  Because I don't.
7  Q.  Have you ever had to owe money to
8 anyone else other than Midland Funding and
9 Midland Credit Management?
10  A.  No.
11  Q.  Have you ever had to pay for anything?
12  A.  Yeah.
13  Q.  You've bought something from the store
14 before, right?
15  A.  Yeah.
16  Q.  When you go to the store and you want
17 to walk out the door with the merchandise, is the
18 store required to let you pay for half of the
19 merchandise now and take the merchandise and come
20 back and pay for it later?
21       MS. CHATMAN:  Objection, calls for
22 speculation.  You may answer.
23 BY THE WITNESS:
24  A.  No.

Page 55

1 BY MS. CONLEY:
2  Q.  Have you read anything in your life
3 that says that you are required to have flexible
4 payment options on a debt that you owe?
5  A.  No, I don't remember.
6  Q.  Have you ever read that before?
7  A.  No.
8       MS. CONLEY:  No further questions.
9       MS. CHATMAN:  I don't have any questions
10 either.
11       MS. CONLEY:  Electronic transcript, no
12 paper.
13       MS. CHATMAN:  I will take an electronic copy
14 too.
15            (WHEREUPON, the deposition was
16            concluded at 2:50 p.m.)

Page 56

1                CERTIFICATE
2                    OF
3       CERTIFIED SHORTHAND REPORTER
4
5       I, ANDREA L. KIM, a State of Illinois
6 Licensed Certified Shorthand Reporter, License
7 number 84-3722, do hereby certify:
8       That previous to the commencement of
9 the examination of the aforesaid witness, the
10 witness was duly sworn or affirmed to testify the
11 whole truth concerning the matters herein;
12       That the foregoing deposition
13 transcript was reported stenographically by me,
14 was thereafter reduced to typewriting under my
15 personal direction and constitutes a true and
16 accurate record of the testimony given and the
17 proceedings had at the aforesaid deposition;
18       That the said deposition was taken
19 before me at the time and place specified;
20       That I am not a relative or employee
21 or attorney or counsel for any of the parties
22 herein, nor a relative or employee of such
23 attorney or counsel for any of the parties
24

Page 57

1 hereto, nor am I interested directly or
2 indirectly in the outcome of this action.
3
4       IN WITNESS WHEREOF, I do hereunto set
5 my hand and affix my seal of office at Chicago,
6 Illinois, this 19th day of June, 2018.
7
8       *Andrea L. Kim*
9       ANDREA L. KIM, CSR
10       License No. 84-3722.